Filed 9/21/23  P. v. Bland CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DOMINIC BLAND,<br><br>Defendant and Appellant. | D080245<br><br><br><br>(Super. Ct. No. SCD291991) |

APPEAL from a judgment of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed as modified.

Savanna Rae Montanez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, Steve Oetting and Michael Dolida, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted Dominic Bland of second degree robbery (Pen. Code,[1]

---

[1]     Undesignated statutory references are to the Penal Code.

§ 211). Bland waived a jury trial on priors and special allegations, and in a bifurcated proceeding the trial court found true allegations that he had suffered a prior serious felony conviction (§ 667, subd. (a)) and one prior strike conviction (§§ 667, subds. (b)-(i); 1170.12). The court also found true several aggravating sentencing factors but found the People had not proved allegations that the offense was carried out with planning, sophistication, and professionalism, that there was a vulnerable victim, or that the crime involved taking great monetary value. The court sentenced Bland to a prison term of 10 years, consisting of the upper term of five years doubled under the "Three Strikes" law.

Bland contends the trial court prejudicially erred by excluding the testimony of his proposed expert psychologist who would have addressed how police interviewing techniques can influence a witness's memory, and therefore was assertedly highly probative of whether the bank teller whom he approached was subjectively afraid for purposes of the fear element of robbery. Bland additionally asks this court to strike from the sentencing minute order and abstract of judgment a $41 criminal theft fine, as well as a 10 percent administrative fee relating to his restitution fine. The People concede the specified fine and fee should be stricken. We agree with the concessions and modify the judgment accordingly, but otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*The Robbery*

In August 2021, Bland, wearing a hat, sunglasses and a face mask, entered a San Diego bank and placed a handwritten note on the counter in front of a teller that said, "Give me the money please." Bland did not present a weapon, brandish anything, threaten the teller, or ask for a specific amount

2

of money.  In accordance with her training, the teller handed Bland about $400 or $500, which was the cash in her drawer.  After he took the money and left, the teller pressed the alarm.

San Diego police officers responded to the bank and contacted the teller.  During an interview recorded on one of the officers' body camera, the officer and teller had the following exchange:

"[Officer]:  Did he present a weapon to you at all?

"[Teller]:  No, no.

"[Officer]:  Did he use any force or fear . . .

"[Teller]:  No.

"[Officer]:  . . . to obtain . . .

"[Teller]:  No.

"[Officer]:  . . . the cash?

"[Teller]:  No, he was very calm.

"[Officer]:  Okay.

"[Teller]:  He was very calm.

"[Officer]:  Did he brandish anything at you?

"[Teller]:  No, no.  [¶] . . . [¶]

"[Officer]:  Were you fearful?

"[Teller]:  You know what, uhm, no.

"[Officer]:  No, okay.  [¶] . . . [¶]

"[Officer]:  Okay, so, you, so you didn't fear for your life or anything like that?  You weren't scared of him at all?

"[Teller]:  No.

"[Officer]:  Okay.

"[Teller]:  I mean, I felt that he was going to rob but—but what—what can you do?  You have to . . .  [¶] . . .

3

"[Officer]:  Were—were you afraid from those actions though?

"[Teller]:  Uh, this is the second time I've been robbed.  So, I have—I know that I have to be calm."

The officer turned to another officer and said in part, "[I] mean it's still—there's no force or fear—" and that it was "488 or 487," referring to the Penal Code sections defining petty and grand theft.  The officer continued: "Cause I mean, if there's no force or fear, and he didn't present a weapon or anything, she wasn't scared."

A few moments later, the officer explained his questions to the teller:

"[Officer]:  . . . [S]o, the reason why I'm asking this is because the—the Penal Code states something specific.  And with robbery it's the intent to gain some form of property using force or fear.

"[Teller]:  Okay.

"[Officer]:  We're trying to establish that and we're trying to meet the elements of specific crimes right now.

"[Teller]:  Okay.

"[Officer]:  That's why I'm asking you.  So, when he gave you that note, internally, not based off your training, you personally, were you scared?

"[Teller]:  I'm scared, yes.

"[Officer]:  Okay.

"[Teller]:  I'm shaking.

"[Officer]:  Okay.  Yeah, all right.  That's why.  I just wanna make sure.  Hey [addressing the other officer], it's a valid 211 [referring to the robbery Penal Code section].  She was scared."

Later, the officer asked the teller additional questions about the robbery, including about the fact she gave the suspect the money without him taking it.  This exchange then occurred:

4

"[Officer]:  Okay.  And you were fearful?  You were scared?

"[Teller]:  Uh, it—I just felt huh . . . nervous.

"[Officer]:  Okay."

*Bland's Pretrial Motion to Introduce Expert Testimony and Court's Ruling*

Before trial, Bland's counsel moved to introduce into evidence the testimony of Dr. John Wixted, a clinical and experimental psychologist and distinguished university psychology professor.  According to counsel, Dr. Wixted had worked on how malleable memory could be and how experiences could affect it.  Counsel stated Dr. Wixted worked specifically on "eyewitness memory and how police actions and the way that police interview witnesses can affect those memories."  He explained Dr. Wixted would address "standards in terms of how you question people and that there are psychological, scientific reasons why these standards are in place."  Counsel anticipated an Evidence Code section 352 argument, stating Dr. Wixted was clear and easy to follow, and that he was not going to give opinions on whether the teller was in fear or lying or whether his client intended to inflict fear, but the jury should consider how her testimony was affected by the way she was questioned by police.  More specifically, pointing out the jury would hear the teller say first that she was not afraid, and then that she was afraid, counsel stated Dr. Wixted would help the jury decide why the teller's first statement "is probably the most reliable one."  Counsel stated that Bland's position would be that the police interview was done improperly and tainted the teller's memory.

The prosecutor pointed out that Dr. Wixted's expert statement, which had been exchanged late the prior week, indicated only that there was a "textbook example of a bad interview."  The prosecutor stated she later received two articles, one "related to a cognitive interview technique that can

5

be used by officers" and another regarding interview techniques in child abuse cases. The prosecutor asserted that neither article addressed the interview techniques described by defense counsel, and Dr. Wixted's curriculum vitae did not indicate he had referenced POST [Peace Officer Standards and Training] protocols or had ever trained San Diego police officers. The prosecutor also pointed out that defense counsel brought up eyewitness identification such as the impact of a photographic lineup, but that was not at issue in the case, and required a "completely different analysis . . . ." According to the prosecutor: "There is not one article cited in [Dr. Wixted's curriculum vitae] or written about by [*sic*] [Dr. Wixted], not one provided to the People, not one research paper or anything to suggest that suggestibility specifically in an interview of an officer can impact or affect an individual's memory related to their own human experience, feeling, and emotion." The prosecutor argued Dr. Wixted was not helpful to the jury as there was body-worn camera footage of the officer's interview, and there was nothing factually significant for him to add as both counsel could make their arguments, which amounted to assertions about the teller's credibility. Finally, the prosecutor argued that fear was an element of the offense, and that Dr. Wixted would be specifically telling the jury that the teller was not in fear or that her first statement that she was not in fear was the only reliable statement without supporting research. The prosecutor argued Dr. Wixted was not qualified to testify on those facts; that his testimony was more prejudicial than probative and confused issues that the jury was meant to decide.

The court indicated its tentative ruling was to exclude the evidence, but invited an Evidence Code section 402 hearing to explore Dr. Wixted's qualifications regarding police officer conduct and standards, as well as the

6

nature of his testimony regarding memory and emotional memory. During questioning, Dr. Wixted explained that his expertise was on "eyewitness memory in general . . . ." When asked about standards and practices regarding police interviews, he acknowledged there had been science-based recommendations in a 1999 Department of Justice report about what police should do on arriving at a scene and interviewing witnesses, but he was unsure whether those protocols had been adopted in California. He described general research that led to the report and a "real-world" example, the 1980's McMartin preschool sexual abuse case, showing that children and adults under repetitive and leading questioning would start saying what the interviewer wants to hear, then come to believe what they said actually happened. Dr. Wixted testified that the problem was that a witness affected by an interviewing technique is not lying: "This is why the whole field has come to a consensus that you have to put your eyes on the very first things that witnesses say, whether it's eyewitness identification or recall. That's the uncontaminated memory test. Because when their memory is changed, they don't know that their memory has changed. And at the time of trial, the jury doesn't know it. The judge doesn't know it. The witness doesn't know it. Nobody knows it. And they are highly confident in telling the truth." He explained that the uncontaminated memory test focused on what witnesses said when they identified someone the first time, or when asked a question the first time: "And that's the most reliable information."

On the prosecutor's questions, Dr. Wixted confirmed that if a witness said one thing when first asked and then said something different later on, the latter statement was "probably contaminated memory. And by then, they may have picked up on what the police want them to say. The police may have made it clear." He confirmed that no California law enforcement agency

7

was legally obligated to follow the Department of Justice recommendations, and that he was not familiar with the San Diego Police Department policy, nor had he taught San Diego Police Department officers about interview techniques. He testified he was unfamiliar with POST. According to Dr. Wixted, there was no distinction between false memories and true memories with respect to a person's feelings or emotions: "[P]eople have this mistaken idea that if it has emotion associated with it, it's a true memory, and a false memory wouldn't, or vice versa; and just—there is no evidence to support that intuition." Dr. Wixted could not point to a specific research study on that point, only studies showing that "you can manipulate any aspect of memory selectively, if you want to."

When defense counsel resumed questioning, he asked why Dr. Wixted characterized the officer's interview as a textbook example of a bad interview. Dr. Wixted testified that he did not mean misconduct, but human nature: "[T]he police are just trying to do their job. The witnesses are just trying to cooperate with them." He explained, "[Y]ou don't ask witnesses questions repeatedly that they have already answered because it's a clear sign—you know, usually witnesses want to help police officers who have come to their aid. . . . [A]nd so if they are giving a clear signal that that's the wrong answer, they are going to respond to that. And you don't suggest information that the witness hasn't already brought up . . . . If the witness has brought it up, you can ask them to elaborate on it, but you don't mention things that the witness hasn't mentioned because they will pick up on that too." In his view, the improper police questioning was not a problem "as long as you focus on the first answer. That's fine, as long as you realize all the later answers are not telling you necessarily what the witness had in their brain. The first answer is doing that. That's why I always say it doesn't really matter if it is

8

done wrong afterwards as long as you know where to put the focus." Dr. Wixted testified that the officer's statement to the teller that the officer needed the element of fear was "a suggestive statement, making it clear what the officer wants from the witness. And witnesses are going to—cooperative witnesses, anyway, are—you know, have a high likelihood of complying. And not so long thereafter, they are going to believe it was true. And they are going to sit there in the courtroom and testify with complete certainty that that's how they felt." He testified that the "uncontaminated forensic memory evidence" would be found in the witness's response to the first question put to them. Dr. Wixted agreed there was a general scientific consensus in the field about these matters.

Answering the court's questions, Dr. Wixted testified that the memory research did not address deliberately lying witnesses, whose truthfulness was the court's province to decide. He stated a question could be clarified as long as the questioner did not suggest anything. He testified it was possible to make suggestions to a witness that would cancel a false memory. But, according to Dr. Wixted, "nothing changes the rule that the best information comes from the first test."

The trial court ruled Dr. Wixted's testimony was more prejudicial than probative under Evidence Code section 352. The court stated it was the jury's province to make credibility and reliability assessments of witnesses and to evaluate witness's prior statements and trial testimony. The court found Dr. Wixted's "opinion that essentially . . . the first statement is always the truthful one" addressed the jury's province to decide whether the teller was being truthful, and that his studies or theories were "not necessarily addressing the witness's recounting of her own feelings and emotions." It ruled the information about the malleable nature of memory, and how it

9

could be "brought back by a series of factors" could be demonstrated through cross-examination. The court found the parts of Dr. Wixted's testimony regarding historical references to police interviewing and the McMartin case could be confusing and divert the jury's attention. The court further ruled Dr. Wixted possessed "no knowledge of the training of this particular officer or San Diego P[olice] D[epartment] or even POST in California," and thus did not have the level of expertise to opine as to the particular police officer's conduct or whether it met San Diego Police Department standards. The court thus excluded the evidence.

*Teller's Testimony*

On direct examination during trial, the teller testified that when Bland entered the bank branch with his face and head covered, she "felt afraid" and "thought he was going to do something." Her training required her to follow Bland's instructions so as to avoid him hurting anyone or taking anyone hostage, and she felt this personally, as she "had a fear" and "was afraid" that "maybe something happen to me [*sic*] or to somebody else." She testified she complied with his request for money because she was not going to struggle with someone and put herself and coworkers at risk of him "doing something" to them or taking somebody hostage because she refused. The prosecutor played the officer's body worn camera video for the jury and provided transcripts.

The prosecutor asked the teller to describe why she had first told the officer she was not fearful, then that she was scared and shaking. The teller responded: "I was in shock when that happened, and I—I keep—I keep my emotions. When something bad happens, it's like—I keep my emotions. It doesn't show up until later. [¶] So what I did that day, I follow the instructions in my job. I was trained for 15 years. I watch a video every day.

10

So I did what I supposed to do. And, yes, I was fearful. I had—I was—I was afraid."[2] Responding to follow up questions, the teller testified again that she was afraid of "something happen [*sic*]. [¶] . . . [¶] . . . [b]ecause I was robbed."

The teller testified that she showed the police officer her shaking hands because she thought the officer might not believe that she was afraid, "[o]r maybe I didn't say the right word." When asked if she was trying to say what she thought the officer wanted her to say, the teller answered that she thought the officer was minimizing the situation and would not look for the suspect if she did not show the officer she was nervous, shaking and scared. She said, "That's when I . . . show my hands. I'm nervous. I'm shaking." The teller testified she was "stressed" about the situation.

On cross-examination, the teller conceded that Bland was cordial and courteous in that he did not say any bad words or anything threatening, nor did he display angry body language. The teller agreed the circumstances were very different from the first time she was involved in a bank robbery years earlier.

*Closing Arguments*

In closing, the prosecutor spent a significant part of her argument on the fear element of robbery. She began with the definition of fear, then reminded the jurors that they were the sole judges of witness credibility and that they should use their common sense and experience to decide whether what a witness said was believable. She discussed direct and circumstantial evidence, arguing there was both direct and circumstantial evidence of the

---

2      The prosecutor asked the teller to explain what she meant by "shock," and the teller responded: "I think I couldn't—I wasn't realizing what was happened to me at that moment. I just was acting like a robot."

11

teller's fear: her shaking was direct evidence, and her immediately handing over the money to Bland was circumstantial evidence of her fear.

The prosecutor highlighted the officer's interaction with the teller on the video as to her fear, pointing to the teller's answer that she was "in shock" and "acting like a robot." She also acknowledged the teller's testimony that she was trained to hand over the money, but stated, "[T]he law is not . . . how were you trained? . . . No. The law is, 'How did you personally feel, and why did you do what you do'—or 'why did you do what you did?' Is it consistent with your training?" The prosecutor specifically addressed the officer's repeated question about whether the teller was fearful, and her answer that she was scared and shaking:

"[Prosecutor]: Very interesting about the 'I'm shaking.' The assumption that the defense counsel said in opening, and may again, and the assumption that you may have had upon seeing that video for the first time in opening statement—just a small portion of it, by the way—the first thing that you may have thought was, 'Well, gosh darn it; that officer is convincing.' Right? [¶] She is saying 'fear' because he said, 'Here are some of the elements I need to make. I'm trying to figure out what's going on.' . . . [¶] . . . [¶] But when he asked [the teller] about that, right, 'Were you trying to say you were scared because the officer convinced you or you wanted to convict this person or you had some motive to get him?' Her interpretation was a complete 180 from what his assumptions were, maybe mine when I first watched the video, maybe even yours. What did [the teller] say? [¶] 'Why were you shaking . . . .? Why did you show the officer that?' [¶] 'I thought he was minimizing what I had to say. I thought he didn't believe me that I was scared, so I showed him my hands.' [¶] Whoa. Not at all maybe what you first thought; right? But who is the person to tell you that

12

interpretation of what she is feeling, why she said those things?  Why is shaking important?  What is shaking a sign of?  Happiness?  Joy?  No.  All of this is her direct evidence of her fear [*sic*]."

The prosecutor pointed to the teller's use of the word hostage, suggesting that if she was not scared she would not bring up the possibility of customers being taken hostage.  She argued the teller's statement that she did not know what could happen was reasonable, logical, comported with common sense, and was "the law that you are guided by."

Defense counsel began his closing by emphasizing the teller's repeated answers to the officer that during the robbery she was not fearful, she did not fear for her life, and she was not scared of Bland "at all."  He argued the teller, who had 15 years of experience along with training in dealing with robberies, was being honest and telling the truth when the officer asked if she was afraid.  He characterized her as feeling as if the officer did not believe her, or was minimizing what had happened unless she told him what he needed to hear: that if she "want[ed] to be taken seriously, I have to say, 'I'm afraid.'  And I know when I talk to the detective later that that's something they will need to hear if I want to be taken seriously.  If I need protection, I need them to take this serious.  I know when I talk to the prosecutor in court that's what I have to say.  I come [*sic*] to believe this."

Defense counsel argued that reasonable doubt was shown by the fact the teller was trained to hand over the money.  He further argued:  "[The teller] said over and over that she wasn't in fear.  I don't need an expert to tell you that memory can change.  Some of you told me in voir dire when we spoke before that you have remembered something and been wrong about it.  Okay?  [¶]  Your memory can be changed by other people, by what they say, by your experiences.  It can happen fast.  So I'm not saying that this was a

13

wily officer that got her to lie and now here we are. I'm saying that this can happen inadvertently. [¶] In this case, it happened after—you saw it happen, after the officer challenged her and said no robbery, no fear."

Defense counsel argued the officer did not focus on discovering the truth, or "go where the evidence led him, which was that this was not a robbery." He argued that another piece of evidence was the officer's reaction, in which he believed the teller and felt there was no crime, telling his partner there was no robbery. He argued to the jury that the People failed to prove fear beyond a reasonable doubt, and thus no robbery occurred.

In rebuttal the prosecutor attacked defense counsel's characterization of the teller as feeling she needed to say she was afraid or had "come to believe" she was afraid, telling the jury there was no evidence of it and it "did not exist." She argued the defense was using logic that everything the teller said after her first statement was a lie: "In order to believe defendant's story for the first statement only to be true, you need every single thing is a lie [*sic*]. Everything else is a lie, that's what you have to believe for that logic to be true."

## DISCUSSION

### I. *Exclusion of Expert Testimony*

A. *Legal Principles and Standard of Review*

" ' "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) An expert may express an opinion on "a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).)' " (*People v. Duong* (2020) 10 Cal.5th 36, 60; see also *People v. Brown* (2016) 245 Cal.App.4th

14

140, 156.) "However, ' " '[w]here the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates.' " ' [Citation.] Expert testimony will be excluded ' " 'when it would add *nothing at all* to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men [and women] of ordinary education could reach a conclusion as intelligently as the witness." ' " ' " (*Brown*, at pp. 156-157; *People v. Edwards* (2013) 57 Cal.4th 658, 709.)

Under these principles, an expert may not give an opinion as to whether another witness is telling the truth. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 81-83; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 176; see also *People v. Brown, supra*, 245 Cal.App.4th at p. 157 [topics that are "categorically off-limits" to expert testimony include witness credibility, "whether a crime has been committed," the "definition of a crime" or "other matters of law even if disguised as opinions about ultimate facts"]; see generally *People v. Sibrian* (2016) 3 Cal.App.5th 127, 133 [" '[e]xpert opinion is not admissible . . . if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of facts as by the witness' "].) "The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful." (*People v. Coffman and Marlow*, at p. 82.)

Thus, in *People v. Coffman and Marlow, supra*, 34 Cal.4th 1, the court explained that a psychological expert may not testify about rape trauma syndrome in order to prove that a rape actually occurred. (*Id*. at p. 82.)

15

There, the California Supreme Court found the trial court should have excluded the testimony of an expert psychologist who, when asked whether a codefendant was "telling you the truth during your interviews," said, " 'Well, . . . in the way . . . that I measure truth, I think she told them as she knew it.' " (*Coffman and Marlow*, at p. 82, fn. 26.)[3]

Similarly, in *People v. Lapenias, supra*, 67 Cal.App.5th 162, the appellate court held it was error to admit into evidence expert testimony that it is " 'rare' " for children to make up a story that abuse occurred. (*Id.* at p. 166; see also *id.* at pp. 177, 180.) That testimony "went considerably beyond the limited purpose of [child sexual abuse accommodation syndrome] evidence" and—"by implication and by inference—violated the general rule that an expert may not give an opinion as to whether another witness is telling the truth or the defendant is guilty." (*Id.* at p. 179.) The appellate court explained there was " 'no meaningful distinction between giving a statistic that indicates that false allegations are rare and stating that children rarely make false allegations without explicitly quantifying the word

---

[3] That expert further testified: " '[I]n my professional opinion, Mr. Marlow was indeed in control of [the codefendant], and I think that's what she told. She told it consistently to the police, to me, to this jury, and I believe it.' [¶] '[P]sychologists are trained to look for whether people are lying or are telling you the truth . . . . [¶] We're looking for reliability, we're looking for validity and of that kind of consistency in the patterns, and then compare that with what I know and studied about human behavior. And that's the way I make those kinds of judgments. [¶] And in my judgment, she was not lying about what happened to her.' " (*People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 82, fn. 26.) The expert answered "Yes" to the question: " '[D]o you feel that [the codefendant] was, generally speaking, a credible reporter to you as to really what was going on about the things that you were asking her about Mr. Marlow?' " (*Ibid.*)

16

"rare." The problem with both assertions is that [the] expert is vouching for the veracity of the' alleged victims." (*Id.* at pp. 179-180; see also *People v. Wilson* (2019) 33 Cal.App.5th 559, 561, 568, 570 [court improperly admitted expert testimony that false child abuse allegations occurred " 'very infrequently or rarely' " and that studies showed false allegations in 1 to 6 percent of cases, as testimony "had the effect of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth" and thus "the practical result was to suggest to the jury that there was an overwhelming likelihood [the victims'] testimony was truthful," which invaded the jury's province].)

In *People v. Sedano* (2023) 88 Cal.App.5th 474, the Court of Appeal explained that an expert who properly testifies about child sex abuse accommodation syndrome to rehabilitate a complaining witness's credibility nevertheless must not "cross over into affirmatively vouching for the truthfulness of a complainant's allegations against the defendant." (*Id.* at pp. 479-480.) Such evidence " 'is not admissible to prove that the complaining witness has in fact been sexually abused.' " (*Id.* at p. 480; see also *People v. Julian* (2019) 34 Cal.App.5th 878, 885.) Accordingly, the expert on that syndrome "may not give ' "general" testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused.' " (*Sedano*, at p. 480; *Julian*, at p. 885.) "[T]he testimony must respect the ' " 'fine but essential' " ' line between an ' " 'opinion which would be truly helpful to the jury and that which merely conveys a conclusion concerning [the] defendant's legal guilt.' " ' " (*Sedano*, at p. 480.)

We review a trial court's evidentiary rulings, including the exclusion of expert testimony allegedly relevant to a proffered defense, for abuse of

discretion. (*People v. Duong*, *supra*, 10 Cal.5th at p. 60 [describing court's discretion in admitting or excluding expert testimony as "broad"]; *People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1110 [court reviews for abuse of discretion lower court's decision as to whether a subject is proper for expert opinion].) Though the court here excluded Dr. Wixted's testimony under Evidence Code section 352,[4] we may uphold its ruling on any ground if correct in result. (*People v. Brown* (2004) 33 Cal.4th 892, 901 [when deciding challenge to admission or exclusion of evidence, appellate court examines the result, not the trial court's rationale].)

B. *Contentions*

Bland contends the court prejudicially abused its discretion and exceeded the bounds of reason by excluding Dr. Wixted's testimony in its entirety. He argues Dr. Wixted was a qualified memory expert, and his testimony would have assisted the jury as jurors would likely be unfamiliar with interviewing techniques that could contaminate memory, unaware that such contamination happens as a result of a witness's psychological inclination to cooperate with an interviewer, and unlikely to know that the field of psychology accepts that a witness's first response is likely to be the least contaminated and most reliable one. He argues Dr. Wixted's opinion is based on decades of psychological research, including the expert's own

---

4    Evidence Code section 352 allows a trial court "in its discretion" to exclude "evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " ' "A trial court's exercise of discretion under [Evidence Code] section 352 will be upheld on appeal unless the court abused its discretion, that is, unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner." ' " (*People v. Nieves* (2021) 11 Cal.5th 404, 472.)

18

research, and it was highly probative of the "key issue at trial: whether [the teller] was subjectively afraid during her encounter with [Bland.]"

Bland maintains that the court could have limited Dr. Wixted's testimony as to the McMartin case or historical research to the extent it was confusing and that the court's concern over his expertise with San Diego Police Department interview techniques was misplaced, as Dr. Wixted was not called upon to give opinions about whether the officer complied with them. According to Bland, the court's blanket decision to exclude Dr. Wixted's opinions "hollowed [his] defense case," thus violating his state and federal constitutional rights to due process and to present a complete defense, as occurred in *Crane v. Kentucky* (1986) 476 U.S. 683. He points out his defense theory was that the teller was unafraid during their encounter, negating the element of fear, and because Dr. Wixted was the only witness that would support that theory, his testimony was " 'all but indispensable to any chance of [the defense] succeeding.' " Bland says that as a result, he was "unable to present any evidence explaining how suggestive questioning can contaminate memory."

Bland argues the error was prejudicial under either state or federal prejudice standards: that "there is a concrete possibility the jury would have acquitted [him] of robbery had the trial court allowed Dr. Wixted to testify" as "[t]he evidence that [the officer] contaminated [the teller's] memory was substantial" and thus there was a reasonable chance the jury would have found the teller was not actually afraid during the encounter. And Bland argues the prosecutor aggravated the error in closing argument. Though he concedes asking jurors to use their common sense and experience to decide whether a witness is telling the truth is consistent with the law, he claims it was "misleading insofar as common sense and experience were insufficient to

19

evaluate [the teller's] fear in this particular case" as common sense and experience would not allow the jurors to consider that the officer's questions could have caused the teller to have a false memory regarding her fear. According to Bland, the prosecutor used a false premise—that the jury would have to believe the teller was lying after her first statement about being unafraid, or that the officer convinced her to testify she was scared—when Dr. Wixted would have made clear witnesses in such circumstances were not lying and that it was an officer's human nature, not misconduct, to engage in a suggestive interview. Though Bland points out his defense counsel sought to raise the defense theory in his closing argument, he maintains it was "half unsupported" without Dr. Wixted's testimony, and " 'not an adequate substitute' " for similar argument based on an expert's explanation of professional research.

C. *Analysis*

We conclude Bland has not demonstrated the court's evidentiary ruling excluding Dr. Wixted's testimony was an abuse of discretion as beyond all bounds of reason. First, we are not convinced Dr. Wixted had the basis in knowledge to render his opinions. The prosecution sought to show the teller told the officer she was afraid when the officer made clear he was asking her about how she felt *personally*, as opposed to what her training instructed. The defense would have had Dr. Wixted counter that by attacking the reliability of the teller's answers about her personal feelings or emotions, even though there is no indication Dr. Wixted ever met with the teller, subjected her to psychological testing, or became familiar with her personal background so as to opine on her personality.

Further, as stated, decisions about a witness's credibility are solely the jury's province. (See *People v. Mumin* (2023) 15 Cal.5th 176, 202; accord,

20

*People v. Wells* (2004) 118 Cal.App.4th 179, 189 [jurors are "considered to be equipped to judge witness credibility without the need for expert testimony"].) As did the trial court, we view Dr. Wixted's testimony as crossing the line into the jury's province to determine the teller's credibility, since the substance and effect of his testimony was that the teller's first statement was the "most reliable" one, and hence that the jury should disregard her later statements as unreliable or false.

Bland acknowledges the general rule expressed in *People v. Coffman and Marlow, supra*, 34 Cal.4th 1 that an expert may not give an opinion on a witness's truthfulness. He argues the rule does not control because he was not calling on Dr. Wixted to opine that the teller was lying, but that certain interview techniques could contaminate a witness's memory without the witness realizing it and the witness coming to believe it. Thus, like an eyewitness identification expert, Dr. Wixted would have provided "additional nuance" as to whether the teller was afraid without telling the jury if the teller was being truthful or accurate in her testimony. He argues the jury retained the power to decide whether to believe the teller, and could have rejected Dr. Wixted's testimony.

We are not persuaded. Dr. Wixted may have denied he was giving an opinion on whether the teller was lying, but the implication and inference of his testimony was that she was dishonest, and thus not credible, when she changed her story and said she was afraid in response to the officer's questions.

Nor is our conclusion altered by Bland's reliance on *People v. Caparaz* (2022) 80 Cal.App.5th 669 and *People v. Page* (1991) 2 Cal.App.4th 161. In *Caparaz*, the Court of Appeal observed that California courts have "long permitted experts to rely 'on *"standardized" psychological tests*.' " (*People v.*

*Caparaz*, 80 Cal.App.5th at p. 684, italics added.) Thus, it held the lower court abused its discretion by excluding the testimony of an expert who administered a particular psychological test to the defendant (*id.* at p. 681) and would have testified the defendant was " 'highly susceptible to giving a false confession under the stress of a police interrogation.' " (*Ibid.*) The appellate court found no countervailing reason to exclude the testimony, that is, it would not have wasted time, or confused or misled the jury. (*Id.* at p. 685.) The *Caparez* court observed that in *Page*, the expert was permitted to testify on " 'general psychological factors which might lead to an unreliable confession,' " but "was not permitted to identify particular elements in the police interrogation of the defendant that indicated those psychological factors were present or to opine on the reliability of the defendant's confession." (*Caparez*, at p. 682, fn. 19, citing *Page*, at pp. 180-183.) Dr. Wixted's testimony here was not dependent on standardized testing as in *Caparez*, and as stated, contrary to the limited testimony in *Page*, it in substance and effect opined on the teller's reliability or credibility such that the trial court here did not abuse its broad discretion in excluding it.

Bland urges that we should rely on *People v. McDonald* (1984) 37 Cal.3d 351 to find Dr. Wixted's testimony would have assisted the jury in assessing the teller's interview and whether she was afraid. In particular, Bland argues the jury would be unlikely to understand how memory contamination happens and how witnesses come to believe false memories. But the expert in *McDonald* involved eyewitness identification, not at issue in this case and not involving the sort of testimony offered by Dr. Wixted, which in effect would have had the jury either credit or discredit the teller's story at various points in recounting her personal feelings or emotions. A trial judge has a responsibility to screen expert evidence for reliability and to

22

determine the total effects of proposed evidence, weighing its probative value against its potential to, among other things, confuse the jury. (Evid. Code, § 352.) Both reliability and the potential for confusion were factors here, and we cannot say the court abused its broad discretion in refusing to admit the expert evidence as unnecessary to assist the jury in deciding the teller's credibility.

We finally emphasize that the exclusion of expert testimony does not constitute a "blanket exclusion of evidence concerning the circumstances of [a particular statement]" if the trial court admits other evidence concerning the circumstances of the statement. (*People v. Linton* (2013) 56 Cal.4th 1146, 1183; see *id.* at pp. 1181-1183 [exclusion of the defendant's "proffered expert testimony regarding false and coerced confessions" did not violate the defendant's right to present a defense where the jury heard audio recordings of the defendant's police interviews and testimony from police detectives].) In *People v. Page, supra*, 2 Cal.App.4th 161, the court found the defendant was not deprived of his constitutional rights to present a complete defense about an alleged inaccurate confession in part because the court permitted the defendant and the prosecutor "to thoroughly explore the physical and psychological environment in which the confession was obtained." (*Id.* at pp. 184, 185.) "Among other things, the jury learned that: [The defendant] was questioned by two police sergeants, both of whom were thoroughly cross-examined on the method of interrogation; the police lied to [the defendant] to extract his confession; the officers made him feel guilty; [defendant] took and failed a polygraph exam; and [he] had only recently learned of [the victim's] death." (*Page*, at pp. 185-186.) The jury further knew the physical details of the interrogation room, the length of the interrogation, and when the defendant got food, drink and other breaks. (*Id.* at p. 186.) Further, the

23

defendant presented his own version of the interrogations, and the expert gave his general testimony. (*Ibid*.) The circumstances were a "far cry from the 'blanket exclusion' of evidence the Supreme Court faced in *Crane*[*v. Kentucky, supra,* 476 U.S. 683]. Unlike *Crane*, [the defendant] was not 'stripped of the power to describe to the jury the circumstances that prompted his confession.' " (*Ibid*.)

Here, while the court excluded Dr. Wixted's testimony about the flaws in the officer's interview and how it impacted the reliability of the teller's memory of how she felt, it admitted the body camera video evidence of her interview, and the teller testified about it. Both the teller and officer were subject to a thorough examination and cross-examination about the events.

Thus, the exclusion of Dr. Wixted's testimony did not constitute a blanket exclusion of evidence of the conditions surrounding the teller's statement, nor did it foreclose Bland's "efforts to introduce testimony about the environment in which the police secured" the statements or deprive him of the ability "to describe to the jury the circumstances that prompted" the teller's statements. (Compare, *Crane v. Kentucky, supra*, 476 U.S. at pp. 689, 691.) Unlike the defendant in *Crane*, on which Bland relies, Bland was not "effectively disabled" from arguing that the manner in which the police obtained the teller's statements "casts doubt on its credibility." (*Crane*, at p. 689 [involving a defendant's confession].) We conclude under these circumstances the court's ruling did not deprive Bland of " 'a meaningful opportunity to present a complete defense.' " (*Id.* at p. 690; accord, *People v. Ramos* (2004) 121 Cal.App.4th 1194, 1206 [because the jury saw a videotape of the defendant's police interview, the defendant was able to attack the reliability of his statement without expert testimony].) "[T]his is not a case

24

like *Crane* where the defense was not permitted to attack the reliability of the [teller's] statement." (*Ibid.*)

II. *Sentencing Issues*

A. *Criminal Theft Fine*

During Bland's sentencing hearing, the court imposed several fines and fees, as well as victim restitution. The court did not order Bland to pay a $41 theft fine under section 1202.5, payable to the San Diego Police Department. Both the minute order and abstract of judgment, however, reflect such a fine.

The oral pronouncement controls over a subsequently entered minute order and the abstract of judgment. (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2; *People v. Portillo* (2023) 91 Cal.App.5th 577, 603; *People v. Pack-Ramirez* (2020) 56 Cal.App.5th 851, 858.) " 'If the clerk includes fines in the court's minutes or the abstract of judgment that were not part of the oral pronouncement of sentence, those fines must be stricken from the minutes and the abstract of judgment.' " (*People v. Clark* (2021) 67 Cal.App.5th 248, 261, quoting *People v. Bongani El* (2021) 65 Cal.App.5th 963, 967.)

Bland contends we must strike the section 1202.5 $41 fine and the People properly concede the point. We agree and strike this fine, and direct the trial court to correct the abstract of judgment and sentencing minute order to accurately reflect the court's oral pronouncement.

B. *Administrative Collection Fee*

During Bland's sentencing hearing, the court imposed a $1,500 restitution fine under section 1202.4, subdivision (b). The minute order for the sentencing hearing includes a 10 percent collection fee under section

25

1204, subdivision (*l*).[5]  Appellant argues that "[b]ased on the plain language of Assembly Bill [No.] 177, the portion of the minute order authorizing the county to collect a 10 percent administrative fee pursuant to former section 1202.4, subdivision (*l*) was legally invalid at the time of sentencing" and must be stricken.  The People agree that to the extent, if any, such administrative fee was triggered, it must be stricken.

Effective January 1, 2022, Assembly Bill No. 177 repealed and then re-enacted section 1202.4, eliminating former subdivision (*l*), which had authorized a county's board of supervisors to impose an administrative fee to cover the costs of collecting a restitution fine.  (Stats. 2021, ch. 257, §§ 19-20.)  By its plain language, Assembly Bill No. 177 renders the balance of these administrative fees that remained on or after January 1, 2022, unenforceable and uncollectible.  (Stats. 2021, ch. 257, § 35.)  Bland was sentenced in March of 2022, so any such administrative fee was no longer valid.  Accordingly, we strike from the judgment the former section 1202.4, subdivision (*l*) administrative fee assessed in connection with the restitution fine.

---

[5]  The court checked boxes on the minute order, which included preprinted language:  "<u>RESTITUTION FINES</u>:  $1500 (PC1202.4(b)) PLUS 10% (PC1202.4(l)) FORTHWITH (PC2085.5)"

## DISPOSITION

The judgment is modified to strike the section 1202.5 $41 criminal theft fine and the former section 1202.4 subdivision (*l*) administrative collection fee. The trial court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects the judgment is affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:

IRION, J.

KELETY, J.

27